The DUN & BRADSTREET COR-
PORATION FOUNDATION,
Plaintiff-Appellant,

v.

UNITED STATES POSTAL SERVICE,
Defendant-Appellee.

No. 1645, Docket 91-6047.

United States Court of Appeals,
Second Circuit.

Argued June 6, 1991.

Decided Oct. 10, 1991.

Michael D. Hess, New York City (Christina LaPolla, White and Case, of counsel), for plaintiff-appellant.

Lisa A. Jonas, Asst. U.S. Atty., S.D. New York, (Roger S. Hayes, Acting U.S. Atty., Marla Alhadeff, Asst. U.S. Atty., S.D. New York, of counsel), for defendant-appellee.

Before OAKES, Chief Judge, and PRATT and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Plaintiff-appellant The Dun & Bradstreet Corporation Foundation ("D & B") appeals from a judgment entered in the United States District Court for the Southern District of New York (Peter K. Leisure, *Judge*), dismissing its complaint for failure to state a cause of action as well as for lack of subject matter jurisdiction. *See* Fed.R.Civ.P. 12(b). The central question presented by this appeal is whether the United States Postal Service's ("Postal Service") "interim" decisions to grant refunds requested by a postal patron created a property interest on behalf of that patron.

In this case, the postal patron, D & B, contends that once the Postal Service initially informed it that its requests for postage refunds had been granted, it gained a property interest in the refunds that was entitled to the procedural protections of the fifth amendment. The district court rejected this contention, concluding that D & B's interest in the refunds was merely an expectation rather than a *bona fide* property right. Accordingly, the district court held that D & B failed to state a cause of action under the fifth amendment and dismissed the complaint.

For the reasons set forth below, we affirm the judgment of the district court in part and reverse and remand it in part.

## BACKGROUND

D & B is a not-for-profit organization that contributes to numerous charitable, educational, scientific, religious, and literary organizations. It primarily earns revenues by conducting vocational educational programs for adults using the "trade style" name Business Education Services.

Pursuant to the Domestic Mail Manual, which was incorporated by reference into the Code of Federal Regulations, 39 C.F.R. § 111.4 (1990), not-for-profit organizations, such as D & B, are afforded the opportunity to make bulk third-class mailings at special, discounted, bulk third-class rates. *See* Domestic Mail Manual § 623.2 (1990). To take advantage of the special bulk third-class rates, the not-for-profit organization must obtain a special rate permit from the "post office where the organization wishes to deposit mailings." Domestic Mail Manual § 642.11 (1990). Once it receives such a permit, the not-for-profit organization may use the special rate if the mail it sends: (1) is solely that of the permit holder; (2) is identified as solely that of the permit holder and indicates that it is being mailed at the special rate; and (3) is accompanied by a mailing statement indicating that it is being sent at a special rate. *See* Domestic Mail Manual §§ 623.5, 623.6, 662.-2(b), 682 (1990). In order to support this postage discount to not-for-profit organizations, the federal government makes annu-al appropriations to reimburse the Postal Service for the difference in postal revenue between mailings made at regular and special bulk third-class rates. *See* 39 U.S.C. § 2401(c) (1988).

In December 1986, the Postal Service's Rates and Classification Center ("RCC") in New York approved D & B's application to make third-class bulk mailings at special rates. Approximately one month later, in January 1987, the Postal Service's Chicago RCC also granted D & B's application to use the special rates in St. Louis.

### A. *New York Mailings*

Shortly after obtaining approval from the New York RCC, D & B attempted to make bulk third-class mailings in New York at the special rate. However, the Postal Service concluded that because these mailings listed as the sender Business Education Services, as well as D & B, the mailings were not eligible for the special rate. Although use of such a "combined format" was technically permissible under Postal Service regulations, the Postal Service had the discretion to refuse to permit these mailings to be sent at the special bulk rate. *See* Domestic Mail Manual § 623.6. Consequently, D & B made these mailings at regular third-class bulk rates. It allegedly received assurances from the Postal Service, however, that if the combined format was later approved, the Postal Service would refund the difference between the regular third-class bulk rates and the special third-class bulk rates for these mailings. Complaint ¶ 14.

After making mailings at the regular bulk rate throughout 1987, D & B submitted a formal refund claim to the Postal Service. By letter dated September 23, 1988, the Manager of Mailing Requirements in New York, Charles V. Messina, informed D & B that "[a]fter a complete review of the case, we have determined that the refund you have requested for the period beginning January 1, 1987 thru and including December 31, 1987 will be approved." Complaint ¶ 17. Messina then requested that D & B tender submissions which would assist the Postal Service in

determining the proper refund amount. After D & B submitted the requested materials, Messina informed D & B on November 26, 1988 that its "request for a Postage refund based on the difference between Regular Bulk and Special rates from January 1st to December 31, 1987, has been approved." Complaint ¶ 20. The letter then stated that D & B's account would immediately be credited with $236,114.04.

Upon receiving this letter, D & B contacted Messina and requested that its refund be in the form of a check instead of a Postal Service credit. Messina referred this request to the Postal Inspector/Auditor. While the Inspector/Auditor was reviewing D & B's file, Messina asked D & B to submit samples of all mailings that it made during 1987. Thereafter, on January 11, 1989, Messina informed D & B that the Postal Service was freezing D & B's refund credit account. He asked D & B to submit additional sample mailings made during the refund period. Two days later, Messina informed D & B by telephone that the Postal Service was placing the refund credit in escrow, freezing the escrow account, and issuing a refund denial order. Messina also stated that the case would remain open until February 10, 1989. D & B submitted the requested information, but protested the Postal Service's decision to freeze its refund account.

Finally, on March 10, 1989, Messina issued a letter denying D & B's application for a refund. D & B appealed the denial of its refund request to the New York RCC. Upon conducting an investigation and concluding that the "refund was improperly granted without supporting documentation," the Acting General Manager of the RCC issued a final agency decision denying D & B's appeal.

### B. *St. Louis Mailings*

At the time the RCC in Chicago approved D & B as a special permit holder, D & B had in its possession approximately two million fliers that were preprinted with the regular third-class bulk rate indicia. D & B subsequently mailed these fliers in St. Louis and then applied to the Postal Service for a refund of the difference in cost between the regular and special rates.

Ruby J. Thorpe, the Manager of Mailing Requirements in the St. Louis office, responded to this request by letter dated February 16, 1988. Ms. Thorpe found that D & B was entitled to a refund of $24,313.94 for mailings it made between the submission of its permit application and the application's approval. However, with respect to the mailings made at the regular postage rate after D & B's special rate application had been approved, Ms. Thorpe stated that the Postal Service could not authorize a refund. D & B appealed this decision to the RCC.

The General Manager of the RCC reversed Ms. Thorpe's decision and directed the St. Louis Division to process the refund application after verifying the refund amount. Thereafter, Ms. Thorpe approved a refund of $39,439.23 representing the difference between the special and the regular rates for mailings D & B had made between January 1, 1987 and August 31, 1987. D & B then requested an increase in the refund amount and submitted various documents in support of its application. Upon review of these documents, Ms. Thorpe reversed her earlier decision and rescinded her approval of the $39,439.23 refund. Once again, D & B appealed.

The RCC then made what it characterized as a final agency decision that D & B's refund request must be rejected. Specifically, the RCC concluded that the Domestic Mail Manual did not afford an organization the opportunity to obtain refunds for mail sent at regular bulk rates after the date its permit application was approved. Additionally, the RCC noted that D & B's mailings were not properly endorsed and thus were ineligible for the special rates.

### C. *District Court Proceedings*

In response to the rejection of its various refund applications, D & B initiated the underlying action in the United States District Court for the Southern District of New York, claiming, *inter alia*, that by issuing and then rescinding refunds, the Postal Service had deprived it of property

without due process of law. Accordingly, D & B sought to obtain refunds for the St. Louis and New York mailings. The Postal Service moved to dismiss the complaint for failure to state a claim pursuant to Fed. R.Civ.P. 12(b)(6) and for lack of jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). The district court granted the motion, concluding that D & B did not have a protected property interest in its refund request.

## DISCUSSION

On this appeal, as in district court, D & B argues that upon receiving initial approval of its New York and St. Louis postal refund requests, it obtained a property interest in those refunds. Thus, according to D & B, the Postal Service could not deprive it of these refunds without providing the due process protections guaranteed by the fifth amendment. In response, the government contends that the Postal Service's decisions approving the New York and St. Louis refund requests were only interim decisions which did not endow D & B with a property right in the refunds. While we agree with the government that it is clear that D & B does not have a protected property interest in the St. Louis refund, we believe that further proceedings are necessary to determine whether D & B possessed a property interest in the New York refund.

The fifth amendment protects an individual from deprivation of life, liberty or property without due process of law. In cases such as this where the protections of the due process clause are sought, the question often arises whether a particular interest in property constitutes a property right protected by the fifth amendment. It is well-recognized that in order for an entity to have a constitutionally-protected property right, it clearly "must have more than a unilateral expectation of [a benefit]. [The entity] must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). We have repeatedly stated that our primary inquiry in determining whether a "legitimate claim of entitlement" exists is

"whether, absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the [benefit] would have been granted." *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 59 (2d Cir.1985); *see Brady v. Town of Colchester*, 863 F.2d 205, 213 (2d Cir.1988); *Sullivan v. Town of Salem*, 805 F.2d 81, 83–84 (2d Cir.1986). Essentially, we have focused on "the extent of the issuing agency's discretion to grant or deny the [relief] in question." *Natale v. Town of Ridgefield*, 927 F.2d 101, 105 (2d Cir.1991).

■ Here, D & B claims that once it initially received notice that its refund requests had been approved, it attained a property interest in the reimbursements. Basically, D & B's argument is premised on the assumption that upon granting the refunds, the Postal Service relinquished all discretion to then rescind its decisions. While we do not deny that this argument has a certain visceral appeal, we cannot agree that by initially approving D & B's refund requests, the Postal Service surrendered its discretion to review and ultimately reverse its decisions granting D & B's refunds.

■ It is widely accepted that an agency may, on its own initiative, reconsider its interim or even its final decisions, regardless of whether the applicable statute and agency regulations expressly provide for such review. *See Gun South, Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir.1989); *Iowa Power and Light Co. v. United States*, 712 F.2d 1292, 1294–97 (8th Cir.1983), *cert. denied*, 466 U.S. 949, 104 S.Ct. 2150, 80 L.Ed.2d 536 (1984); *United States v. Sioux Tribe*, 616 F.2d 485, 493, 222 Ct.Cl. 421, *cert. denied*, 446 U.S. 953, 100 S.Ct. 2920, 64 L.Ed.2d 810 (1980); *cf. United Gas Improvement Co. v. Callery Properties, Inc.*, 382 U.S. 223, 229, 86 S.Ct. 360, 364, 15 L.Ed.2d 284 (1965). Ordinarily, however, an agency may undertake such reconsideration only if it does so within a reasonable time period and affords the claimant proper notice of its intent to reconsider the decision. *See Bookman v. United States*, 453 F.2d 1263, 1265, 197 Ct.Cl. 108 (1972). This policy balances the desirability of finality

against the general public interest in attaining the correct result in administrative cases. *See generally Civil Aeronautics Board v. Delta Air Lines, Inc.*, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961). Consequently, the Postal Service had the discretion to review the Mailing Managers' decisions granting the refunds, provided that the Postal Service afforded D & B proper notice that these decisions would be reconsidered and that such review was undertaken within a reasonable period of time.

■■■■ In considering these issues and their application to this case, we are required to construe in favor of the plaintiff all of the allegations contained in the complaint, since this case arises as an appeal from a district court decision granting a Rule 12(b)(6) motion to dismiss. *See Papasan v. Allain*, 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986); *see also Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Morales v. New York State Dept. of Corrections*, 842 F.2d 27, 30 (2d Cir.1988). With respect to the St. Louis refund, we conclude that it is clear that the Postal Service afforded D & B proper notice that it intended to reconsider its decision to grant the requested refund and that it reconsidered its decision within a reasonable time after it was made. Initially, we note that the Manager of Mailing at the St. Louis branch reviewed her decision granting the refunds only after D & B submitted a claim that it was entitled to a greater refund than she had approved. It was only then that the Manager of Mailing reexamined D & B's additional supporting documents and concluded that D & B's documentation as a whole did not support the refund. Thus, since the decision was reconsidered at D & B's behest, D & B may not complain that the Postal Service reconsidered its decision after an unreasonable period of time had expired or that the Postal Service did not afford it adequate notice of the Postal Service's intent to reconsider. Accordingly, the district court did not err by finding that the Postal Service had considerable discretion to reconsider and then deny D & B's St. Louis refund request. The district court correctly concluded that D & B did not have a protected property interest in the St. Louis refund and therefore could not state a claim upon which relief could be granted.

■■■ With regard to the New York refund, however, we are unable to find as a matter of law that the Postal Service reconsidered the refund request within a reasonable time and afforded D & B proper notice of its intent to reconsider. According to the complaint, D & B first received notice on September 23, 1988 that the Postal Service had approved D & B's New York refund request. Although the complaint also states that the Postal Service required D & B to make additional submissions at that point—indicating that the decision may not have been final—the Postal Service's written assurance of a refund could be considered by a factfinder to be an initial decision in favor of granting D & B's refund request. Accordingly, for purposes of considering the government's Rule 12(b) motion, we view the September 23, 1988 letter as the initial refund decision. The complaint then alleges that the Postal Service informed D & B by telephone on January 13, 1989 that its refund credit was being reconsidered. Thus, upon viewing the facts alleged in the complaint in the light most favorable to D & B, we can assume that eighty-one weekdays expired between the initial refund decision and the Postal Service's decision to reconsider. While the government argues that it was reasonable for the Postal Service to allow this amount of time to elapse before reconsideration, we do not believe such a judgment can be made without the benefit of additional information concerning the circumstances surrounding the decision to reconsider. We believe that a determination of whether the "time-lapse" was reasonable will turn on, among other things, the complexity of the refund decision, whether the decision was factually or legally based, and whether the Postal Service acted according to its general procedures for review. Basically, the allegations contained in the pleadings do not by themselves indi-

cate whether the Postal Service acted within a reasonable time.

Similarly, because we must accept D & B's claim that it never received written notice that the Postal Service intended to reconsider its refund decision, we cannot as a matter of law find that the Postal Service afforded D & B proper notice of its intent to reconsider. Consequently, because it is unclear whether the Postal Service acted within its discretion by reconsidering the New York refund, we find that the district court erred by disposing of the fifth amendment claim to the New York refund on the basis of the government's Rule 12(b)(6) motion.

Although we express no opinion on the merits of D & B's New York refund claim at this point, we hasten to express our discomfort with governmental agencies that either fail or refuse to promulgate rules concerning reconsideration of their decisions. We believe that the absence of such rules at the agency level can result in administrative unfairness to individual claimants. Indeed, it is quite clear that an agency without these kinds of rules has the potential to give claimants the proverbial run-around. Nevertheless, we emphasize that we make no judgment as to the propriety of the Postal Service's decision to review the New York refund.

■ D & B next contends that, notwithstanding any legitimacy of the Postal Service's reconsideration of D & B's refund applications, it gained an entitlement to both of the requested refunds by virtue of the doctrine of equitable estoppel. Specifically, D & B asserts that it detrimentally relied on Postal Service employees' representations that it would be entitled to a refund for the New York mailings if it made these mailings at regular, rather than special, rates. Additionally, D & B claims that it relied on the Postal Service's "lack of response" to its inquiry regarding refunds for the St. Louis pre-paid mailings. In light of the Supreme Court's recent decision in *Office of Personnel Management v. Richmond*, — U.S. —, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), D & B's contentions must be rejected.

In *Office of Personnel Management*, the Supreme Court held that a claimant may not assert a monetary claim of estoppel against the government when the funds used to pay this claim will come from the Federal Treasury, but are not authorized by statute. Because the Appropriations Clause of the Constitution mandates that funds from the Treasury be expended in accordance with statutory law, the Court concluded that the government cannot constitutionally make a payment of public funds contrary to statutory authorization. *Id.* 110 S.Ct. at 2471. Accordingly, an estoppel claim that will require the payment of government funds in contravention of a statute will fail. While the Court recognized that "[i]t ignores reality to expect that the Government will be able to 'secure perfect performance from its hundreds of thousands of employees scattered throughout the continent,'" it nevertheless determined that "[t]o open the door to estoppel claims would only invite endless litigation over both real and imagined claims of misinformation by disgruntled citizens, imposing an unpredictable drain on the public fisc." *Id.* at 2476 (quoting *Hansen v. Harris*, 619 F.2d 942, 954 (2d Cir.1980) (Friendly, J., dissenting), *rev'd sub nom. Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981)).

■ In this case, because the federal government appropriates money to account for the difference between the special and the regular bulk third-class rates, any refund that D & B would receive will come from the public Treasury. Thus, under *Office of Personnel Management* we must consider whether D & B's estoppel claim is contrary to statutory authorization. The New York mailings, which used the combined format, did not strictly conform to the Domestic Mail Manual's requirement that the exempt organization be clearly listed as the sender. While the Postal Service retained discretion to approve an exempt organization's "alternative designation," it is nevertheless clear that the Postal Service also possessed the discretion to deny a refund for mailings made using those alternative designations that it did not approve.

**196**

*See* Domestic Mail Manual §§ 623.1 & 623.6. With regard to the St. Louis mailings, we note that D & B's purported reliance on the Postal Service's failure to respond to its refund inquiry cannot support a claim of estoppel. Even so, because D & B admits that it mailed two million pieces labelled with regular bulk rate—instead of special rate—indicia, it is clear the St. Louis mailings did not conform to Domestic Mail Manual Requirements. *See* Domestic Mail Manual § 662.2(b). Therefore, because both the New York and St. Louis mailings did not adhere to statutory requirements, *Office of Personnel Management* forecloses D & B's estoppel claims. Accordingly, the district court correctly dismissed the portions of the complaint seeking relief on the basis of estoppel.

### CONCLUSION

Based on the foregoing, we affirm the judgment of the district court with respect to its dismissal of the St. Louis refund claims, we affirm with respect to its dismissal of D & B's estoppel claims and we reverse and remand with respect to D & B's due process claims concerning the New York refund.