**HIGH SIERRA HIKERS ASSN,
et al., Plaintiffs,**

v.

**Bernie WEINGARDT, et
al., Defendants.**

**No. C–00–01239 EDL.**

United States District Court,
N.D. California.

Oct. 30, 2007.

Peter M.K. Frost, Western Environmental Law Center, Eugene, OR, Julia Ann Olson, Wild Earth Advocates, San Francisco, CA, for Plaintiffs.

David Bernard Glazer, U.S. Department of Justice, San Francisco, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS–MOTION FOR SUMMARY JUDGMENT

ELIZABETH D. LAPORTE, United States Magistrate Judge.

### I. Background

On April 10, 2000, Plaintiffs High Sierra Hikers Association, et al. ("Plaintiffs") filed this action for declaratory and injunctive relief against Defendants Bradley Powell, et al. ("Defendants")[1], alleging violations of the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1687, the Wilderness Act, 16 U.S.C. §§ 1131–1136, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370d and the Administrative Procedure

---

1. Defendant Powell has been replaced as a defendant in this matter by the current Regional Forester of the Forest Service, Bernie Weingardt.

Act ("APA"), 5 U.S.C. §§ 701–706 arising from the Forest Service's allowance of special use permits for commercial packstock operations in the Ansel Adams and John Muir Wilderness areas. On June 5, 2001, the Court issued an order regarding the merits of the parties' cross-motions for summary judgment, and on January 9, 2002, after further briefing, issued an order granting injunctive relief and ordering the Forest Service to complete a NEPA cumulative impacts analysis by December 31, 2005 and a site-specific analysis for each special use permittee for packstock operations by December 31, 2006. The Court also ordered interim protective measures, including, *inter alia,* a reduction in the service day allocation for packstock operators, a reduction in maximum packstock group size and implementation of trailhead quotas. Both sides appealed.

On December 1, 2004, the Ninth Circuit issued its decision affirming the Court's ruling that the Forest Service violated NEPA and the Court's order of injunctive relief. *See High Sierra Hikers Ass'n v. Blackwell,* 390 F.3d 630 (9th Cir.2004). The Ninth Circuit reversed the Court's grant of summary judgment in favor of the Forest Service under the Wilderness Act, holding that "the Wilderness Act imposes substantive requirements on an administering agency and that there are triable issues of fact regarding whether the Forest Service damaged the wilderness areas." *Blackwell,* 390 F.3d at 649. The Ninth Circuit remanded on the Wilderness Act issue, stating:

The equitable relief granted by the injunction in practicality addresses most of the substantive violations of the Wilderness Act pending the Forest Service's compliance with NEPA, as ordered by the district court. However, the injunction does not address remediation of any degradation that may have been caused by packstock services before the 2001 Needs Assessment. The requirements of NEPA are procedural, to assure that the agency takes a hard look at the important environmental factors, whereas the Wilderness Act sets forth substantive requirements to protect the wilderness. Until such time as the Forest Service complies with the court's order concerning the NEPA procedural requirements, and thereafter reaches a decision concerning the commercial activity permissible in the Wilderness Areas, the Court's interim injunction largely addresses the requirements of the Wilderness Act. The ultimate decision of the Forest Service will remain subject to the substantive requirements of the Wilderness Act. We affirm the decision of the district court in granting the injunction, but reverse the summary judgment with respect to the Forest Service's compliance with the Wilderness Act and remand to the district court for a determination of appropriate relief under the Wilderness Act for remediation of any degradation that has already occurred.

*Blackwell,* 390 F.3d at 649. The Ninth Circuit also stated:

The Forest Service's decision to grant permits at their pre-existing levels in the face of documented damage resulting from overuse does not have rational validity. In its Needs Assessment, the Forest Service listed the trailheads showing damage from overuse, but it did not take the next step to actually protect those areas by lowering the allowed usage. Given the Wilderness Act's repeated emphasis of the administering agency's responsibility to preserve and protect the wilderness areas, this decision cannot be reconciled with the Forest Service's statutory responsibility.

*Blackwell,* 390 F.3d at 648.

At a status conference in February 2005, the parties agreed that the question of

remediation of past wilderness degradation should be held in abeyance until the Forest Service completed the court-ordered environmental analyses pursuant to NEPA by the end of 2005 and 2006. Subsequently, on December 27, 2005, the Forest Service issued a Final Environmental Impact Statement ("FEIS") and Record of Decision for the Trail and Commercial Pack Stock Management in the Ansel Adams and John Muir Wildernesses ("2005 ROD") adopting Alternative 2–Modified from the FEIS that addressed the cumulative impacts of pack stock operations in the Ansel Adams and John Muir Wilderness Areas. Administrative Record ("AR") 8880, *et seq.*

The Court held a status conference on March 7, 2006. At that conference, the Court gave Plaintiffs leave to file an amended complaint at the conclusion of the administrative appeal process for the 2005 ROD. Plaintiffs' administrative appeal of the 2005 ROD was subsequently denied.

On August 31, 2006, Plaintiffs filed an amended complaint challenging the 2005 ROD. In September 2006, Plaintiffs sought an extension of the injunctive relief ordered by the Court in January 2002. In November 2006, the Court declined to extend the terms of the injunction, which applied pending completion by December 31, 2006 of site-specific environmental analyses for each special use permittee.

In May 2007, Plaintiffs filed a motion for summary judgment alleging that the Forest Service, through the 2005 ROD, violated the Wilderness Act and NEPA, and seeking wide-ranging injunctive relief. The Forest Service opposed that motion and filed a cross-motion for summary judgment. The cross-motions were fully briefed and the Court held a hearing on the merits on September 5, 2007. The Court deferred the issue of Plaintiffs' proposed injunctive relief pending a decision on the merits.

## II. Standard of Review

 The Court reviews challenges under the Wilderness Act and NEPA under the APA to ensure that the agency has not acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706; *Blackwell,* 390 F.3d at 638. "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The Court's role is to:

> consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. The final inquiry is whether the Secretary's action followed the necessary procedural requirements.

*Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

 The Court must determine whether the EIS was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Okanogan Highlands Alliance v. Williams,* 236 F.3d 468, 471 (9th Cir.2000); *City of Carmel–By–The–Sea v. United States Dep't of Transp.,* 123 F.3d 1142, 1150 (9th Cir.1997); *West-*

*ern Radio Servs. Co., Inc. v. Espy,* 79 F.3d 896, 900 (9th Cir.1996). Courts apply a "rule of reason" standard, which assesses "whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Churchill County v. Norton,* 276 F.3d 1060, 1071 (9th Cir.2001) (quoting *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir.1974)); *see also City of Carmel,* 123 F.3d at 1150–51 ("the National Environmental Policy Act requires a 'reasonably thorough' discussion of the environmental consequences in question, not unanimity of opinion, expert or otherwise.") In making this determination, a court must make a " 'pragmatic judgment whether the EIS's form, content, and preparation foster both informed decision-making and informed public participation.' " *Churchill County,* 276 F.3d at 1071; *City of Carmel,* 123 F.3d at 1150–51. " 'Once satisfied that a proposing agency has taken a "hard look" at a decision's environmental consequences, [our] review is at an end.' " *City of Carmel,* 123 F.3d at 1151 (quoting *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir.1992)). The purpose of an EIS is to provide full and fair discussion of significant environmental impacts and to inform decision makers and the public of reasonable alternatives which would minimize adverse impact to the environment. 40 C.F.R. § 1502.1.

Review under the Wilderness Act proceeds under the framework adopted in *The Wilderness Society:*

> If the statute is clear and unambiguous, no deference is required and the plain meaning of Congress will be enforced. [citations omitted]. If the statute is ambiguous, the agency's decision is entitled to *Chevron [U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ] deference if it has the force of law.

> [citation omitted]. If the decision does not have the force of law, it is reviewed with "respect" according to the factors set out in *[United States v.] Mead,* [533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) ] and *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). [citation omitted].

*Blackwell,* 390 F.3d at 638–39 (citing *The Wilderness Soc'y v. United States Fish & Wildlife Serv.,* 353 F.3d 1051, 1059–60 (9th Cir.2003) (*en banc* )).

## III. Discussion

### Wilderness Act

Wilderness areas "shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness ...." 16 U.S.C. § 1131(a). Wilderness is defined "in contrast with those areas where man and his own works dominate the landscape ... as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." 16 U.S.C. § 1131(c). It is further defined as an area that "generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable" and "has outstanding opportunities for solitude or a primitive and unconfined type of recreation." *Id.* An agency responsible for administering designated wilderness areas shall "preserv[e] the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also *to preserve its wilderness character.*" 16 U.S.C. § 1133(b) (emphasis added). Regulations provide that the wilderness areas will be administered "to meet the public purposes of recreational, scenic, scientific, educational, conservation and historical uses; and it

**1074**

shall also be administered for such other purposes for which it may have been established in such a manner as *to preserve and protect its wilderness character."* 36 C.F.R. § 293.2 (emphasis added).

■ The Wilderness Act prohibits commercial enterprises in wilderness areas (16 U.S.C. § 1133(c)), but authorizes commercial services within wilderness areas "to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas." 16 U.S.C. § 1133(d)(5). The Forest Service has interpreted these sections to permit pack stock services. *See* 36 C.F.R. § 293.8. Therefore, the Wilderness Act requires that the Forest Service make a finding of necessity before authorizing commercial packstock services in the wilderness areas, and then may only authorize those services to the extent necessary. *Blackwell,* 390 F.3d at 646–47.

■ The parties have somewhat different interpretations of the Wilderness Act. Plaintiffs argue that the Act requires the Forest Service to preserve the wilderness character, not simply maintain existing degraded conditions. *See* 16 U.S.C. § 1131(c); 36 C.F.R. § 293.2; *Blackwell,* 390 F.3d at 649. Defendants respond that "maintain" and "preserve" are synonyms and that there is no general restoration requirement. While Defendants may be correct that there is no automatic restoration duty in the abstract, the Wilderness Act does impose a general requirement on the Forest Service to manage wilderness areas so as to preserve the land's wilderness character. More importantly, under the specific circumstances here of the Forest Service's demonstrated failure in the past to fulfill this mandate, leading to severe degradation due to excessive commercial stock use, the Ninth Circuit recognized a need for remediation under the Wilder-

ness Act in its instructions to this Court. *See Blackwell,* 390 F.3d at 648–49.

■ Plaintiffs also argue that the Forest Service must limit commercial services in wilderness areas to those supporting a "primitive and unconfined type of recreation." 16 U.S.C. § 1131(c). In its Manual, the Forest Service has expressed its interpretation of appropriate policy under the Wilderness Act by providing "direction for those portions of the National Forest System that are designated by Congress as units in the National Wilderness Preservation System." AR 16061. With respect to management of recreation, one of the objectives of the Forest Service is to "provide, consistent with management of the area as wilderness, opportunities for public use, enjoyment and understanding of the wilderness, through *experiences that depend on a wilderness setting."* AR 16071 (emphasis added). Specifically, the Forest Service has adopted a policy regarding commercial pack services:

> Consistent with management as wilderness, permit outfitter/guide operations where they are necessary to help segments of the public use and enjoy wilderness areas for recreational or other wilderness purposes.

AR 16071. Defendants' policy of wilderness-dependence is not taken out of context, as Defendants contend in their briefs; to the contrary, it is consistent with the objectives and policies stated in the Manual. Although the Manual does not have the independent force of law (*see Western Radio Servs. Co. v. Espy,* 79 F.3d 896, 902 (9th Cir.1996)), it represents the Forest Service's interpretation of the appropriate policies under the Wilderness Act and therefore cannot simply be disregarded, as Defendants would have it.

Moreover, the Forest Service Manual's interpretation is consistent with the mandates of the Wilderness Act. As set forth

above, the Wilderness Act requires the Forest Service to limit public use of commercial services in the wilderness for recreational, scenic and other authorized purposes to the extent necessary and only as consistent with the overall imperative of preserving and protecting the wilderness character of the land. Defendants must reconcile the use of commercial services with what the land can tolerate while remaining wilderness, so as not to elevate recreation over longtime preservation of the wilderness character. *See Blackwell,* 390 F.3d at 647. The Forest Service correctly recognized in its Manual that limiting recreational use to that which is wilderness-dependent strikes the appropriate balance between these competing interests. Restricting public recreation by means of commercial services "to the extent necessary" to realize "the recreational or *other wilderness* purposes" of the land helps ensure its continued character as wilderness. Whereas public needs for non-wilderness dependent recreation can be met in areas outside the wilderness boundaries, including other parts of the national forests, overuse for unnecessary purposes within the wilderness degrades the physical environment and reduces the outstanding opportunities for solitude which Congress intended wilderness areas to afford. *See* 16 U.S.C. § 1131(c).

**The survey methodology underlying the Needs Assessment was unreliable.**

▇ In an effort to determine the need for commercial services in the Ansel Adams and John Muir Wilderness Areas, as required by the Ninth Circuit's decision in this case, the Forest Service prepared a Needs Assessment in December 2005. AR 8849, *et. seq.* The Needs Assessment concluded that the public need for commercial pack stock in the wildernesses was actually higher than the level that was currently provided. AR 8849. The Forest Service obtained its data for those conclusions by sending out a survey to certain overnight pack stock clients and by gathering anecdotal evidence from pack stock operators and clients regarding day rides. The survey was sent to "individuals who identified themselves as the group leader and provided their names and addresses when receiving their wilderness permit." AR 8866. The Forest Service found that overall need for commercial pack stock services ranged from 7,329 to 9,234 overnight clients and from 5,400 to 7,500 day ride clients. AR 8874–75. In 2004, by contrast, there were 4,015 overnight clients and approximately 4,000 day rides. *Id.*

▇ An agency's choice of methodology to assess the impact of its actions is entitled to deference, but if the methodology is unreliable, the choice of that methodology and decisions based thereon are arbitrary and capricious. *See Ecology Ctr. v. Austin,* 430 F.3d 1057, 1064 (9th Cir.2005). To determine the trustworthiness of a survey:

> it must be shown: (1) that a proper "universe" was examined and a representative sample was chosen; (2) that the persons conducting the survey were experts; (3) that the data were properly gathered and accurately reported; and (4) that the sample design, the questionnaires and interviewers, as well as the respondents, were unaware of the purpose of the study.

*Friends of the Boundary Waters Wilderness v. Bosworth,* 437 F.3d 815, 825 (8th Cir.2006) (citing *Lutheran Mut. Life Ins. Co. v. United States,* 816 F.2d 376, 378 (8th Cir.1987)). In *Boundary Waters,* the Eighth Circuit squarely addressed the propriety of a Forest Service decision insofar as it was based on survey results, and held that unreliable and inadequately explained survey data demonstrated that reliance on the survey results was arbitrary and capri-

cious. *Boundary Waters*, 437 F.3d at 825–26 (stating that the survey regarding motorized watercraft usage was deficient because: it was sent to only thirteen property owners, only five of whom returned a completed form; there was no evidence that the Forest Service considered whether this group would provide accurate and representative results; the Forest Service made unsupported extrapolations regarding use based on responses to a question that was factually incorrect; the respondents were aware of the purpose of the survey; and the Forest Service sought information about motorcraft use going back twenty years).

The survey at issue here suffers from fundamental deficiencies that render reliance on the results to determine the need for commercial stock operations arbitrary and capricious. Like the *Boundary Waters* survey, the survey here allowed anonymous responses without any means to verify that the respondents were the intended recipients of the survey (unlike, for example, absentee balloting in elections), and the recipients knew its purpose. Most strikingly, there is evidence that respondents took advantage of these flaws in the survey's design by copying and distributing the survey to non-recipients friendly to the packers and encouraging these individuals to return the survey anonymously in a deliberate effort to skew the results. For example, one survey recipient typed on the survey form:

> If you know of anyone else who would like to support the packers, please spread the word and the survey with info.... I would say, feel free to copy this on your printer, fill it out and mail it in anonymously. Use the same address for the return address as the mailing address on the envelope. That is what they have on the envelope that they mailed to me.

Supplemental Administrative Record ("SAR") SAR 2869. Similarly, another recipient stated on the survey that:

> I will keep in touch with this issue and do *everything* I can to support the Pack Stations. I have emailed this survey to about 30 who use the Pack Station services!

SAR 2834 (emphasis in original). This apparent ballot-stuffing makes it impossible to rely with even minimal confidence on the accuracy of the results.

In addition, there has been no showing that an appropriate universe of respondents was chosen. For example, the Forest Service sent out surveys to pack station clients "who identified themselves as the group leader and provided their names and addresses when receiving a wilderness permit," which totaled 537 of 4,105 overnight clients. AR 8866. It is unclear why only group leaders were chosen to receive the survey or why the Forest Service did not conduct further investigation to find names and addresses for those left blank.

As a whole, the survey results on which the Needs Assessment is based are unreliable, especially because the design was flawed and the results subject to manipulation. Further, as set forth in more detail below, the survey confused "need" with the desire to pack in excessively heavy optional items that could not be carried in by even the fittest backpacker. Accordingly, the Forest Service's reliance on the survey to calculate need was arbitrary and capricious.

**Additional flaws in the Needs Assessment**

The Needs Assessment was unreliable in other respects as well. Defendants made sweeping statements about need based on an aging population, which it assumes will be unable to "carry a backpack and access the wilderness on an overnight trip" (AR

8869), based on only limited anecdotal evidence and certain very general trends. In relying on an aging population with various disabilities to show a huge increase in future need for pack services, Defendants cited the most frequently occurring health conditions of elderly people. Yet these conditions included hearing impairments, sinusitis and others which are irrelevant to determining the need for pack stock services due to an inability to hike with gear. AR 8874. At the same time, the Needs Assessment ignored improvements in medical care such as hip and knee replacements. Furthermore, the Needs Assessment is unreliable in concluding that the demand for commercial pack stock trips would necessarily increase commensurately with an aging population, without considering, for example, the competing demand for trailer or car camping, cruises or other more sedentary vacations.

**The extent of the finding of need in the Needs Assessment was arbitrary and capricious.**

The Wilderness Act permits commercial services to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas. 16 U.S.C. § 1133(d)(5). The Needs Assessment identified six categories of need for pack stock services: (1) persons with physical limitations that make them unable to walk and/or carry their own equipment; (2) persons with equipment too bulky or heavy to carry; (3) hunters needing pack stock to haul game; (4) persons desiring a wilderness "pack trip" or "day ride" experience; (5) persons able to walk but affiliated with persons falling into need categories one through four and therefore included as members of commercial pack groups; and (6) Native American traditional walks or gatherings requiring pack stock to transport camps and those unable to walk. AR 8863–64.

The Court recognizes that the Forest Service need not quantify need with complete mathematical precision, but to the contrary has considerable leeway in choosing how to do so. However, basic mathematical errors and the inclusion of some arbitrary categories of "need" resulted in an unreliable and inflated estimate of the need for commercial pack services. For example, of the 346 of the 537 survey recipients who returned the survey, 81% "reported that they could not have met the purpose of their trip in a trip outside the wilderness." AR 8867. Thus, 19% or almost one-fifth of the respondents took commercial stock trips that were not wilderness-dependent, but could have been taken outside the wilderness in less pristine areas. Yet later in the Needs Assessment and again in the ROD, the Forest Service extrapolates from the small percentage of respondents and inexplicably converts 81% to 90% to conclude that approximately 90% of the current level of commercial use is needed to meet the public's need. Thus, it stated: "As the 2005 Commercial Pack Client survey showed, approximately 90% of the current level of commercial use is needed to meet the public's need for these services. Given the 2004 level of 4,015 commercial clients, it is estimated that 3,613 of these clients truly 'needed' the service in the context of this Needs Assessment." AR 8874; *see also* AR 8900 ("Nearly 90% of the groups surveyed had an unqualified obvious need for the service and the vast majority of the need was related to age or physical limitation."). If the Forest Service used its own data showing 81 %, the number would not be 3,613, but 3,252.

Most of the categories of need are reasonable. Pack stock services are necessary for certain people who cannot walk or carry necessary gear. *See Blackwell*, 390 F.3d at 647 ("Under the broad terms of

the Act, a finding that packstock was needed to provided access to those people who would otherwise not be able to gain access for themselves or their gear, can support a finding of necessity."); AR 8863 (need category 1). Further, although the Forest Service could have concluded differently, it was reasonable to find that pack services are necessary for persons able to walk but traveling with persons who cannot walk or carry certain gear. AR 8864 (need category 5).

■ By contrast, some of the categories of need selected by the Forest Service are arbitrarily overinclusive. Most importantly, the Forest Service's decision to count all persons with equipment too heavy or bulky to carry on foot as "in need of" commercial pack services was arbitrary and capricious. AR 8863 (need category 2). This category includes people seeking to transport items such as large radios, heavy floats and bulky furniture, that are unnecessary for wilderness travel and, indeed, incompatible with the wilderness experience of other people who seek to enjoy the "outstanding opportunities for solitude" and areas "where the earth and its community of life are untrammeled by man" that Congress mandated. 16 U.S.C. § 1311(c); AR 9921 (public comment to the DEIS regarding commercial pack groups carrying in beer cases, tables, chests and chairs, and holding "night time parties [that] are similar to a Raider tail gate party."); AR 9946 (public comment to the DEIS stating that "[i]n what is supposed to be a wilderness experience I find it very upsetting to arrive at a location and find a pack group with radios, hard liquor, tables, chairs, etc."). Significantly, use of these types of items in the wilderness is contrary to the Forest Service's own recognition that "[e]conomy, convenience, commercial value and comfort are not standards of management or use of wilderness." AR 16066. As one survey respondent stated: "Were very disappointed to see people abusing the stock services by taking in entire ice chests and lawn chairs. This requires more stock, and therefore more damage to trails and resources." SAR 2863. The Forest Service's argument that such items are not specifically forbidden in the wilderness area confuses the absence of a specific prohibition with the requirement of necessity; the fact that something is otherwise "legal" does not make it necessary.

■ Further, the Needs Assessment concludes that persons desiring a wilderness pack trip or day ride experience need commercial services. AR 8864 (need category 4). However, the Needs Assessment itself characterizes these activities as desires, rather than needs. AR 8864 ("Persons *desiring* a pack trip but who lack knowledge or skills to handle or use stock in wilderness setting; Persons *desiring* a pack trip but who lack wilderness knowledge to safely and properly travel and camp in a wilderness setting, and require professional assistance to guide and advise them; Persons *desiring* a pack trip but who do not own stock or otherwise have access to suitable pack stock; Persons *desiring* a pack trip who own private stock suitable for wilderness use but who practically cannot use their own stock.") (emphasis added). Similarly, the Needs Assessment states that "[p]ersons who may be able to walk and carry their own equipment, but elect to experience wilderness with riding and pack stock—the historical 'Sierra Pack Trip'—are also in need of commercial pack stock services in those wilderness areas." AR 8865. But this conclusion improperly equates "preference" with "need," especially when such pack stock trips could be made in scenic non-wilderness. Further, the Needs Assessment does not distinguish between day

rides that are necessary and those that are not (such as those that could be taken in adjacent non-wilderness forest) and therefore forecasts a very substantial but inflated increase in day rides in the wilderness. AR 8875 (estimating an increase in level of need for day rides of 35–50%).

Defendants argue that the standard is not wilderness dependency, but instead wilderness appropriateness. Yet as set forth above, the Forest Service Manual states that wilderness management should provide opportunities for use of the wilderness "though experiences that depend upon a wilderness setting." AR 16071. To the extent that a person simply desires a horseback ride which could be taken in scenic areas outside the wilderness, that experience is not wilderness-dependent. *Cf.* AR 8871 ("Likewise, there is a need for a scenic destination for the trip."). By equating desire with need, Defendants have not established the necessity for the existing level of all day rides in the wilderness, much less the increased number of rides projected in the Needs Assessment (5,400 to 7,500 clients, compared to the current level of 4,000 or an increase of from 35% to 88%).

■ The Needs Assessment also did not adequately analyze the need for spot and dunnage trips, which constitute 80% or more of the overnight services provided by packers. AR 8859. These trips are generally used by people who are physically capable of hiking, but who want their gear packed in or want to go deeper into the wilderness. While Plaintiffs argue to the contrary, Defendants are correct that many may need stock support to make an initial ascent or begin their trip with full packs before consuming food. However, there is evidence that some spot and dunnage trips are used by people who want to evade the trailhead quotas, rather than by those who need them. AR 14227 (report

to Congress that "prospective backpackers who are unable to get permits enter on commercial stock permits and then continue their trips backpacking."); AR 14892 (stating that "[a]ll the pack stations quietly admit that the daily quotas for hikers has benefitted them since it has increased their business."); AR 14891 (ranger complaint about this practice); SAR 2850 (survey respondent used pack services because permit not otherwise available). The Needs Assessment is deficient in failing to assess this issue.

■ The Needs Assessment is also arbitrary and capricious in assuming sharp increases in future use of commercial packstock services without reconciling this projection with the long-term downward historical trend. Specifically, the Needs Assessment estimates that demographic trends will result in a 75–100% increase in future need for commercial pack services and a 35–50% increase in future need for day rides. AR 8873, 8875. Yet it does not acknowledge, much less justify, the fact that this future projection represents an abrupt about-face from the historical trend over more than five decades. AR 8852 ("Since the 1950s, the number of pack stations has decreased considerably. Likewise, the number of stock and clients serviced has also decreased.... This downward trend continued into the 1990s."); 8853 ("Since the 1950s, there has been a trend towards fewer pack stations, commercial stock in the wilderness areas, and clients utilizing the services."); 8855 ("This represents an average of 925 fewer clients or a 22 percent reduction between the 1970s and 2000."). Defendants do not even attempt to explain this sharp contrast between historical experience and their future projection.

■ Finally, Defendants rely on anecdotal evidence to conclude that there is a "sizeable percentage" of unmet need con-

sisting of people who are unwilling or unable to pay the costs for packstock services. AR 8872 ("Furthermore, there is likely a sizeable group of individuals who need commercial packing services and fit into a need category but are unable to afford the service. . . . It is impossible to determine the number of people that are unable to afford the service each year and 'needed' the service to access the wilderness. Given that nearly 90% of current use fits into one of the Need Categories, it is logical to assume a sizeable percentage of individuals are unwilling or unable to pay for the escalating price of these services."). This category of purported need is difficult to understand because the task is to determine the need for *commercial* services, as opposed to hypothetical governmentally-provided, nonprofit or subsidized services. The Forest Service does not explain why it does not employ the usual definition of demand for commercial services as willing buyers who can afford to and choose to buy the services at the price offered.

**The Destination Management strategy does not adequately address the preservation of wilderness character and improperly allows harmful spikes in use.**

 Destination management uses destination quotas rather than trailhead quotas to control frequency of use of wilderness destinations. AR 7934. Destination quotas limit the total number of trips in a given year by each commercial stock operator to specified destinations "to meet the desired resource and experiential condition for the area, considering the recreation category and the resource capacity of the destination." AR 7509; AR 7934 ("Destination quotas provide site-specific spatial controls on commercial pack stock operators."); *see also* AR 8927–8932 (destination management is an adaptive management approach to "managing resources

where the planning process includes recognizing the uncertainty in existing knowledge related to the resource being managed, and treats management actions as experiments or as hypotheses to be tested using monitoring specifically designed for the particular action."). The 2005 Plan also imposes a "stock-at-one-time-in-wilderness" standard to complement the destination management scheme. "Stock-at-one-time-in-wilderness" means the maximum number of stock per pack station that are allowed in the wilderness (at any and all destinations combined) on any given day. AR 7512. The numbers were "derived from an analysis of recent stock use on trails, current resource concerns, visitor capacity considerations, cumulative impacts and management objectives." *Id.*

Destination management, which focuses on the number of trips to particular places in the wilderness each year but not when those trips are taken, can be an appropriate tool if combined with other safeguards that adequately address the temporal issue of excessive simultaneous use by multiple packers. As set forth in the 2005 Plan, however, there are several aspects that run afoul of the Wilderness Act. First, as noted above, the Ninth Circuit has already cautioned that allowing pre-existing levels of use from the 2001 Plan to continue in light of the demonstrated degradation that usage has already caused to the wilderness environment is irrational:

> The Forest Service's decision to grant permits at their pre-existing levels in the face of documented damage resulting from overuse does not have rational validity. In its Needs Assessment, the Forest Service listed the trailheads showing damage from overuse, but it did not take the next step to actually protect those areas by lowering the allowed usage. Given the Wilderness Act's repeated emphasis of the administering

agency's responsibility to preserve and protect the wilderness areas, this decision cannot be reconciled with the Forest Service's statutory responsibility.

*Blackwell*, 390 F.3d at 648. Yet, under the destination management scheme adopted in the plan, the allocation of trips to each destination is largely unchanged from the excessive levels of 2001–2004, and "overall use remains relatively constant." AR 7934.

■ Second, the destination management plan allows for significantly increased commercial packstock use in some parts of the wilderness, including areas previously recognized by the Forest Service as already heavily damaged from excessive stock use. In addition, some pack stations will have more stock allowed in the wilderness than their allocated or reported actual stock use in previous years. AR 14071–72. For example, three pack stations—Rock Creek, Pine Creek and McGee—use the Hilton Lakes destination, which the Forest Service has previously categorized as already seriously degraded. AR 1207; AR 1051–54 (destinations such as Hilton Lakes labeled as "red" if there are strong concerns about environmental resources such that current use affected resource quality). The EIS claims that pack stock use in the Hilton Lakes area would be "reduced slightly." AR 8009. Plaintiffs point out, however, that the 2005 Plan allocates 60 spot and dunnage trips and up to 25 full service trips to Hilton Lakes, or 85 combined, which exceeds the use from 2001 to 2004 which ranged from 38 to 67 packstock trips of both types combined (with an average of 53). AR 9042–44. Defendants do not dispute Plaintiffs' numbers, but argue that the total number of trips theoretically possible is unlikely under destination management. AR 8009.

Other examples include Glacier Pack Train, which had historic use of 25 stock established by a 1982 Operating Plan, and an allocation and reported use in 2001 of 30 stock for all uses. AR 14071. Yet its new stock-at-one-time limit under the 2005 Plan is 35 stock. *Id.* Lost Valley Pack Station had historic use of 14 stock established by a 1997 written communication, 2001 allocated use of 20 stock, and 2001 actual use of 17 stock. AR 14072. Yet its new stock-at-one-time limit under the 2005 Plan is 25 stock. *Id.*

Further, with respect to Glacier Pack Train, the maximum number of trips under the 2005 Plan exceeds the maximum reported use from 2001 to 2004. The number of trips allocated under the 2005 Plan is 166 (AR 14077; 9058–60), whereas the maximum number of trips per year from 2001 to 2004 was 161, with a range from 81 to 161. *Id.* Defendants argue that comparing actual use to authorized use is somehow improper. But comparing authorized use to past actual use makes sense: there is no reason to authorize an increase over past actual use levels when that actual use exceeded the area's capacity, causing degradation of the wilderness.

Defendants also rely on the bare statement in the EIS that operators are not likely to use all trips assigned to them in one year, while the limit on stock at one time helps assure that use remains similar to past and recent levels of use. AR 7935. But the EIS does not provide any basis for the assumption that operators will not use their stock quotas to visit the same popular places as in the past, perpetuating the degradation from prior excessive stock use. Further, even if pack stations do not use their maximum allocation, there is nothing in the Plan to preclude all pack stations from operating at the maximum trip and stock-at-one-time levels.

■ Third, the 2005 Plan improperly allows spikes in use in violation of the Wilderness Act. Spikes result from concentrated use and are defined as "high, short duration use levels by commercial operators." AR 1376. Spikes cause intensified harm to the wilderness such as "the creation of new campsites since all existing sites may be occupied, enlarging of existing sites since large groups may be a cause of the spike event, and loss of solitude since greater numbers of people are encountered in travel and while camping when spikes occur." *Id.*

Almost all visits to the two wildernesses at issue occur in the summer, especially during weekends, holidays and the first two weeks of August. AR 7697, 8857, 8872. The short summer season in these high mountain areas during which travel is not obstructed by snow and other weather conditions compresses most use by humans into a very short time frame each year. Before trailhead quotas were introduced, concentrated use resulted in harmful spikes in use by hikers and packers. In 1998, for example, the Forest Service documented heavy overuse at Hilton Lakes. AR 14308. To prevent spikes, the Forest Service implemented trailhead quotas in the 2001 Plan. AR 1376 ("Trailhead quotas on commercial use were determined to be the best mechanism to address adverse impacts caused by spikes."); 9487 ("establishing trailhead quotas is necessary to reduce resource impacts caused by peak use periods and to help distribute use over time and space for a quality wilderness experience"). The goal was to generally eliminate large spikes that had been a source of previous negative impacts on the wilderness. AR 1198. The trailhead quotas worked; indeed, the Forest Service touted them as best suited to preventing the severe disruptions to the experience of solitude in the wilderness caused by spikes as well as concentrated physical impacts such as trampling. AR 7926 (trailhead quotas are "preventing spikes in use"); 7925 ("Spikes in trailhead use typically occur on the holiday weekends, and in the first two weeks of August, at popular well-known destinations.... This current quota mechanism is best for reducing the experiential impacts of crowding by controlling the sheer number of people allowed to enter the wilderness area each day."); 927 (quota system feasible for packstock operators).

In abandoning trailhead quotas in the current FEIS, Defendants argue that the quotas were not effective in controlling spatial distribution of use because after visitors enter at a particular trailhead under a quota, they may disperse to any area accessible by that trail and others with which it intersects. AR 7925–26 ("The trailhead quota does not effectively control the spatial distribution of use. With less effective control of spatial distribution, there is higher probability that ecological values will be impacted. With trailhead quotas, the frequency of use or number of times a destination gets used is not controlled."). But the destination quotas and stock-at-one-time limitations contained in the 2005 Plan also allow visitors to use one-way spot and dunnage trips as a starting point to hike wherever they want to in the wilderness. The same is true for two-way spot and dunnage trips to the extent that people can disperse once they are dropped off.

Moreover, even though Defendants themselves previously determined that trailhead quotas worked to limit temporal spikes, Defendants jettisoned the quotas and now rely on the stock-at-one-time limitation instead to prevent spikes in use. AR 7935 ("Operators are not likely to use all the trips assigned to them each year. Some years destinations may never get used. Other years, destinations may re-

ceive maximum use. By imposing a limit on the number of stock each operator can have in the wilderness at one time ensures there are no spikes in use and use levels will remain similar to recent and past levels of use."). Plaintiffs argue persuasively that the stock-at-one-time limitation does not adequately prevent spikes in use and allows an excessive number of stock in the wilderness at any one time. For example, Plaintiffs note that allowable stock in John Muir and Ansel Adams is 915 head (AR 7512–13), which can be used wherever operators choose among 189 destinations. AR 8885. Thus, at Hilton Lakes, the three operators who serve this area and have 200 total stock could use all of their stock at one time in the Hilton Lakes area, such as the popular first week in August, which would create a harmful spike. As another example, Plaintiffs point to Frontier Pack Trains, which conducts trips almost exclusively on the Rush Creek Trail (AR 7964), and is allowed 75 stock each day, and thus has the potential to use over 1000 head of stock on that trail over a two-week period. AR 7965. Defendants argue that historical use patterns differ, and Frontier is only allocated 85 spot and dunnage trips, so it is unlikely that it would take its maximum stock out over a two week period, thereby using up nearly half of its annual spot and dunnage trips.

Yet Defendants fail to acknowledge that the peak season for visitors is very short and concentrated, so pack stations may well use most if not all of their annual destination allocations and stock-at-one-time during the busiest times, that is, holidays and the first two weeks of August, when spikes have historically occurred at the most popular locations. Defendants also point out that spikes are not expressly prohibited by the Wilderness Act. But here, the Forest Service has previously found that spikes in stock use caused degradation in these particular wilderness areas—damage from which it will take years to recover. Yet the Forest Service's Plan allows more harmful spikes to occur. For all of these reasons, the Destination Management plan runs afoul of the Wilderness Act.

Moreover, Plaintiffs argue that the adaptive management strategy allows improper modifications of standards and limits contained in the ROD without going through the process of formal plan amendment or compliance with NEPA.[2] *See Klamath Siskiyou Wildlands Ctr. v. Boody,* 468 F.3d 549, 557 (9th Cir.2006) (rejecting BLM plan that allowed BLM to make changes to the plan without meeting its regulatory duty to formally amend the plan where plan said that it "contemplated a wide swath of changes."). However, there is no indication at this point that the Forest Service intends to avoid its NEPA obligations in the future if and when changes are made. *See In re Operation of the Missouri River Sys. Litig.,* 363 F.Supp.2d 1145, 1164 (D.Minn.2004) ("Absent evidence that the adaptive management process actually results in the Corps' evasion of NEPA obligations, the Court declines to declare this approach invalid."). To the contrary, Defendants represent that if a management change requires NEPA analysis, the Forest Service will engage in that analysis. *See* Defs.' Cross–Mot. for Summ. J. at 35:4–9. Therefore,

---

**2.** Defendants argue that Plaintiffs' complaints about the adaptive management plan are premature because the ROD only establishes an overall scheme, and actual permitting decisions will be the subject of the 2006 RODs. Plaintiffs respond that their appeals of the 2006 RODs were denied in May. Moreover, the 2005 ROD states that the 2006 planning process "will not revisit decisions made in this ROD." AR 8923. Therefore, Plaintiffs' arguments are ripe.

the adaptive management strategy as currently set forth does not violate NEPA.

**The Forest Service violated NEPA by failing to take a hard look at the harm to the Yosemite Toad caused by commercial pack stock operations.**

Plaintiffs argue that the EIS violates NEPA and the Wilderness Act with respect to the Yosemite Toad. They argue that Defendants violated NEPA by failing to consider a reasonable alternative to protect the Yosemite Toad, and by failing to take a hard look at the harm to the Toad resulting from packstock use not only in their breeding areas, but elsewhere. They also contend that Defendants violated the Wilderness Act by determining that packstock grazing will have negligible impacts on the Yosemite Toad.

■■■ Defendants respond that Plaintiffs are barred by the doctrines of exhaustion and waiver from raising any claims related to upland habitat of the Yosemite Toad, as opposed to the toad's breeding habitat, because Plaintiffs failed to raise this issue in their comments to the DEIS or in their administrative appeal. *See Department of Transp. v. Public Citizen,* 541 U.S. 752, 764–65, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004) ("Persons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration.") (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council,* 435 U.S. 519, 553, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)); *Idaho Sporting Cong., Inc. v. Rittenhouse,* 305 F.3d 957, 965 (9th Cir. 2002) ("The Administrative Procedure Act requires that plaintiffs exhaust available administrative remedies before bringing their grievances to federal court.").

In their comments to the DEIS, Plaintiffs stated that "stock animals should be prohibited entirely from entering occupied breeding habitat for Yosemite Toads." AR 11149. In their administrative appeal, Plaintiffs stated that the FEIS would "allow grazing by commercial packstock to continue in degraded areas, and in areas that are habitat for sensitive species (such as Yosemite Toad), relying largely on commercial operators to monitor and report use." AR 14034. They also stated that the FEIS ignored the concern of resource specialists "about allowing stock to access Merriam Lake and Meadow using a steep, unconstructed and improperly located trail, and about permitting grazing in a meadow that is so wet that it never reaches range readiness and is occupied Yosemite Toad habitat." AR 14082. Plaintiffs further commented that "one key concern is that the FEIS/ROD would allow grazing in sensitive wetland areas without adequate controls to prevent significant impacts from grazing and trampling, including but not limited to adverse impacts to sensitive and seriously declining species, such as Yosemite Toad." AR 14111. Accordingly, Plaintiffs sufficiently raised the issue of Yosemite Toad habitat in their comments and in the administrative appeal. Even though they did not distinguish between breeding and upland rearing habitat, the Forest Service itself believes those habitats are the same. *See* Defs.' Reply at 30:2–4 ("While the EIS and ROD speak in terms of excluding from 'breeding habitat,' the fact is that breeding habitat and rearing habitat are one and the same thing—the wet portions of the meadows with standing water or saturated soil.") (citing AR 6249) (referring to wet habitat for, and timing of, breeding and rearing). Accordingly, Plaintiffs are not barred from raising the issue of upland rearing habitat here.

■■■ The Yosemite Toad is found only in the Sierra Nevada, and 90% of its cur-

rent habitat is in the John Muir and Ansel Adams wildernesses at issue here and, as its name suggests, in Yosemite National Park. AR 7347, 11878. The Yosemite Toad population has declined precipitously; it is no longer present in 50% of the locations that it once occupied, and local populations have dwindled in the sites where it still lives. AR 8148, 17450. In 2002, the Fish & Wildlife Service determined that the Yosemite Toad is warranted for listing under the Endangered Species Act and identified packstock as a cause of its decline. AR 17447, 17450–51; *see also Blackwell*, 390 F.3d at 642, n. 5 ("Livestock activities are cited as a factor in the decline of the Yosemite Toad."); AR 7348 (egg masses, tadpoles and small toads are highly vulnerable to trampling from packstock); AR 7349 (packstock may collapse burrows where toads seek cover or hibernate); AR 7392 (toad metamorphs are vulnerable to trampling); AR 2356 (wet habitat is vulnerable to trampling); AR 7393 (packstock grazing reduces vegetative cover).

The 2005 Plan allows packstock grazing in at least thirty-six meadows with Yosemite Toad breeding habitat. AR 7809 (of 267 meadows that have Yosemite Toad breeding habitat, approximately 81 breeding sites overlap with commercial packstock operations, primarily the grazing aspect of the operations). The Plan prohibits packstock from entering unsuitable or critical areas and relies on operators to manage their packstock to avoid entry into those areas. AR 7513 ("No stock entry or use will be allowed in areas identified as critical or unsuitable. The stock user is expected to manage stock to avoid stock entry. Operators planning on using meadows with identified critical areas, must describe the techniques they plan to use to avoid entry. This must be approved in the annual operating plans."). Nonetheless, the Forest Service deter-

mined that it is "likely packstock could drift into breeding areas on occasion even under close management." AR 7398.

Defendants argue that this exclusion provision satisfies their obligation to incorporate mitigation measures to offset any environmental damage. *See* 40 C.F.R. § 1502.16(High Sierra Hikers) (stating that an EIS "shall include discussions of ... means to mitigate adverse environmental impacts."); *Environmental Protection Information Center v. United States Forest Service*, 451 F.3d 1005, 1015 (9th Cir.2006) (upholding analysis of mitigation measures that had been incorporated into the project itself). The Forest Service prepared a Biological Evaluation ("BE") to assess packstock entry into areas that support the Yosemite Toad, which concluded that "the effect of grazing and trail use on the persistence of toad population in any of the meadows where pack stock use overlap could occur in the future is unknown." AR 7391. Yet the FEIS states that impacts of packstock on the Yosemite Toad would be negligible. AR 8418–22 ("The effects of implementation of Alternative 2–Modified destination use regulating system for commercial pack stock operations would likely have no substantive effects on Yosemite toads and their breeding habitats, similar to Alternative 1."). Moreover, there is evidence that the BE "entirely failed to consider an important aspect of the problem." *See, e.g.,* Martin Decl. ¶ 6 (study "almost completely ignored the habitat needs of subadult and adult Yosemite Toads under the false assumption that the breeding areas are primary zones of grazing impacts.").

█ "One important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 351, 109

S.Ct. 1835, 104 L.Ed.2d 351 (1989); *see also Neighbors of Cuddy Mountain v. United States Forest Service,* 137 F.3d 1372 (9th Cir.1998) ("Mitigation must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated."). At the same time,

> There is a fundamental distinction ... between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other.... it would be inconsistent with NEPA's reliance on procedural mechanisms-as opposed to substantive, result-based standards-to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act.

*Methow Valley,* 490 U.S. at 352–53, 109 S.Ct. 1835.

In *Okanogan Highlands Alliance v. Williams,* 236 F.3d 468 (9th Cir.2000), the court determined that the discussion of mitigation measures was extensive and satisfied NEPA. Specifically, the EIS described mitigation measures for a gold mine project, including comprehensive monitoring, methods to prevent overflow from the project from affecting water quality and further methods for achieving water quality standards if initial methods fail. *See Okanogan,* 236 F.3d at 476–77. Further, each mitigation process was evaluated and given an effectiveness rating. *Id.*

By contrast, the EIS in *Cuddy Mountain* contained only a "perfunctory" discussion of mitigation as follows:

> [S]mall increases in sedimentation and other effects of logging and road construction in Grade and Dukes creeks would be mitigated by improvements in fish habitat in other drainages.... Even minor improvements in other drainages, such as Wildhorse River or the Weiser River, would affect more fish habitat than exists in Grade and Dukes creeks. (See Forest Plan, page IV–38 for a list of offsetting mitigation projects.). Offsetting mitigation would include such projects as riparian enclosures (fences around riparian areas to keep cattle out) and fish passage restoration (removing fish passage blockages). These activities can be effective but cannot be quantified with present data.

*Neighbors of Cuddy Mountain,* 137 F.3d at 1380 ("A mere listing of mitigation measures" is not enough to satisfy NEPA). The Ninth Circuit determined that this cursory discussion was inconsistent with the hard look the Forest Service was required to take pursuant to NEPA. *See id.* at 1381 ("... the Forest Service did not discuss which (or whether) mitigating measures might decrease the increased sedimentation in the three creeks affected by the timber sale. In fact, we read the EIS as suggesting that the Forest Service did not even consider mitigating measures for the creeks actually affected by the sale, apparently because the Forest Service believes that mitigating measures elsewhere in Payette could 'compensate' for the harms caused to the three creeks in the Grade/Dukes area. It is also not clear whether any mitigating measures would in fact be adopted. Nor has the Forest Service provided an estimate of how effective the mitigation measures would be if adopted, or given a reasoned explanation as to why such an estimate is not possible.... The Forest Service's broad generalizations and vague references to mitigation measures in relation to the streams affected by the Grade/Dukes project do not constitute the detail as to mitigation measures that would be undertaken, and

their effectiveness, that the Forest Service is required to provide.").

In this case, the Forest Service argues that the prohibition on grazing in sensitive areas is the mitigation measure. *See* AR 7513 ("No stock entry or use will be allowed in areas identified as critical or unsuitable. The stock user is expected to manage stock to avoid stock entry. Operators planning on using meadows with identified critical areas, must describe the techniques they plan to use to avoid entry."); *see Environmental Protection Information Center v. United States Forest Service*, 451 F.3d 1005, 1015 (9th Cir.2006) (upholding analysis of mitigation measures that had been incorporated into the project itself.). In *Environmental Protection Information Center*, however, the agency provided specific and detailed information on how the project would be conducted to reduce its environmental impacts, including ongoing monitoring. *See Environmental Prot. Info. Ctr.*, 451 F.3d at 1015–16 ("In short, given the specificity of the protection measures, the analysis of the environmental impacts with these measures in place, and the provision for ongoing monitoring to ensure compliance, USFS has taken the requisite 'hard look' at the Project's environmental consequences."). By contrast, here, the Forest Service has failed to provide specific information regarding mitigation measures to protect Yosemite Toad habitat. Instead, the Forest Service simply assigns responsibility for stock management to the packstock operators despite the fact that it is "likely packstock could drift into breeding areas on occasion even under close management." AR 7398. Drift fences are mentioned in the FEIS (AR 7514), but there is no discussion of their effectiveness in preventing stock incursion on Yosemite Toad habitat. At the hearing, Defendants argued that electric fencing could prevent packstock from infringing on the Toad habitat, but when questioned by the Court, could not explain how such electricity could be supplied in the wilderness area either as a practical matter or consistent with the primitive wilderness character of the areas.

The discussion of mitigation measures here is more like the perfunctory analysis in *Cuddy Mountain* than the extensive evaluation in *Methow Valley* or *Okanogan*. Relying on the packstock operators to monitor their stock to exclude them from breeding habitat despite the reality that even close management will not prevent drift of stock into that sensitive habitat does not constitute an adequate discussion of mitigation measures or the requisite hard look at this issue.

Further, the Plan fails to consider other reasonable alternatives under NEPA to protect the Yosemite Toad. Plaintiffs point to a statement by an agency wildlife biologist in 2001 noting that the relatively small number of meadows where packstock grazing overlapped with remaining habitat for the Toad, and recommending that the Forest Service "exclude grazing throughout the entire season in Yosemite Toad breeding and rearing habitat." SAR 2356. Plaintiffs argue that Defendants did not consider this alternative, and instead asked packstock operators where they wanted the stock to graze. AR 7524 ("grazing zones ... are based on areas requested for grazing by the commercial pack operators."). The Forest Service considered eliminating all commercial pack use from the wilderness in Alternative 5 in the FEIS, but found that although it "would have a long-term beneficial effect," the "extent and magnitude of this effect is unknown in terms of how it would actually affect toad use or breeding meadows and population dynamics and viability."

The fact that the Forest Service acknowledged the long-term benefits but failed to determine how those benefits would actually affect the Toad in a number of ways reinforces the conclusion that the Forest Service failed to take a hard look at the impacts to the Yosemite Toad pursuant to NEPA. Accordingly, the Court need not reach the Plaintiffs' argument that the Forest Service also violated the Wilderness Act on this issue.[3]

**The Forest Service failed to take a hard look at water quality issues in the FEIS and allowed further degradation through increased grazing in already impacted areas in violation of the Wilderness Act.**

■ Plaintiffs contend that the Forest Service violated NEPA and the Wilderness Act by failing to adequately address water quality issues arising from packstock use. It is undisputed that the Forest Service did not collect quantitative data regarding water quality in the wilderness areas. Defendants argue, however, that to comply with NEPA, they need only take a hard look at environmental consequences and need not necessarily collect quantitative data. Further, they argue that since water quality was an insignificant issue, more extensive NEPA analysis was not necessary. AR 8236–37 ("water-borne bacteria and nutrients from pack stock manure is a minor concern over most areas of the wilderness, although the risk is not under-stood very well."); AR 8238 (concluding based on literature review that it is "unknown" whether the quantity and extent of stock manure deposited in water and carried by runoff is "enough to cause measurable water quality degradation wilderness-wide or locally," and that "it is not likely a significant issue" because previous water quality sampling in other wilderness areas did not indicate degraded water quality); *see also* AR 7773–75.

Defendants further contend that the management of meadows as required by the FEIS is consistent with the 2001 Wilderness Plan and the Sierra Nevada Forest Plan Amendment Riparian Conservation Objective, both of which require only that the Forest Service ensure that the meadow habitats remain at Proper Functioning Condition.[4] AR 8239. The FEIS specifies that meadows with streams that are non-functional or functional at risk with a downward trend are to be rested. AR 8254–55 ("Meadows found to be unsuitable for grazing, outside of designated grazing zones, or that have currently unacceptable impacts would be closed to use and only meadows found to be suitable for grazing would be open for grazing.").

The Environmental Protection Agency ("EPA") commented to the Forest Service that "a detailed description and commitment to monitoring measures and enforcement is not provided in the DEIS. The

---

**3.** Plaintiffs' recasting of the Yosemite Toad issue as a Wilderness Act claim seems to attempt to import the requirements of the Endangered Species Act (16 U.S.C. § 1531–1544), which is not at issue here because the Toad has not been listed, into the Wilderness Act. Plaintiffs acknowledged that they were not aware of any authority for addressing endangered species issues under the Wilderness Act.

**4.** Under the Proper Functioning Condition protocol, streams are evaluated for their functional condition, and given a rating of properly functioning, functional-at-risk with an upward trend, functional-at-risk with no apparent trend and functional-at-risk with a downward trend. *See* AR 8239, 8246. Of the 230 meadows evaluated in the FEIS, 93 were found to have "at least slight hydrologic function alteration" and 17 have severe hydrologic function alteration. AR 8257. Twenty-two percent of these meadows may show recovery, 65% will remain in the same altered condition, and 13% could have a downward trend. AR 8257.

lack of this information is of significant concern." AR 11871. Further, the EPA stated that it was "concerned by the minimal water quality and ecological improvements provided by the proposed action alternatives." *Id.* Moreover, the EPA expressed its concern that the FEIS affords only "minimal improvement in identified degraded conditions in meadows, streams and trails." AR 12046.

The Court shares the EPA's concerns on these issues. Moreover, instead of resting degraded areas as stated in the FEIS, Plaintiffs point out that the Plan permits grazing in meadows along functional-at-risk streams whose trend is unknown. AR 12203; 9051 (permitting some grazing in Lower Hopkins Basin where there are functional at risk streams with unknown trend). The Plan does not preserve the wilderness character of the area insofar as it allows this grazing, much less take into account remediation of past degradation, which this Court was instructed to do in *Blackwell.* For example, the EPA raised the issue of grazing in Jackass Meadow (AR 12046), which has "severe hydrologic function alteration," yet the Plan increases permissible stock grazing to up to 2,025 stock nights per year in the meadow, up from around 400. AR 8257. The FEIS states that grazing in Jackass Meadow "could increase the extent of hydrologic function alteration beyond that being caused by dam operations." AR 8257–58. The FEIS states that if the meadow shows a major increase in hydrologic function alteration, the grazing numbers will be reduced (AR 8258), but by then it will be too late. Allowing grazing in a meadow that already suffers severe hydrologic function alteration is inconsistent with Defendants' obligation under the Wilderness Act. Defendants' conclusion that packstock should not be restricted from all areas with degraded streams and meadows is contrary to the Wilderness Act. Moreover,

Defendants' examination of water quality issues, including monitoring and enforcement, is inadequate in light of the EPA's significant concerns, and is irrational to the extent that it permits grazing in meadows with streams that should be rested pursuant to the Plan. Thus, Defendants failed to take a hard look at water quality issues in violation of NEPA.

**Plaintiffs failed to show that they exhausted their administrative remedies with respect to grazing by domestic livestock.**

The FEIS states that: "Past and present grazing from production livestock and pack stock is thought to be the largest contributor to meadow hydrologic function alteration." AR 8254. Plaintiffs argue that the FEIS does not consider the impact of the six active domestic livestock grazing allotments in the wildernesses or the cumulative effects of the livestock grazing and commercial grazing. AR 7338.

However, because Plaintiff failed to raise this issue in the comments to the DEIS (AR 11079–160) or in their administrative appeal of the ROD (AR 14011–133), they are barred from doing so here. *See Department of Transp. v. Public Citizen,* 541 U.S. 752, 764–65, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004) ("Persons challenging an agency's compliance with NEPA must 'structure their participation so that it … alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration.") (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council,* 435 U.S. 519, 553, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)); *Idaho Sporting Cong., Inc. v. Rittenhouse,* 305 F.3d 957, 965 (9th Cir.2002) ("The Administrative Procedure Act requires that plaintiffs exhaust available administrative remedies

before bringing their grievances to federal court.").

**The Forest Service's change to the campfire policy was arbitrary and capricious in violation of the Wilderness Act and NEPA.**

■ In the 2001 Plan, the Forest Service prohibited all campfires above 10,000 feet in the north and 10,400 in the south. AR 7929. In the 2005 Plan, the Forest Service proposed to modify the elevational fire closure boundary: (1) to allow fires for all visitors in areas where a certain amount of firewood is available; (2) to allow charcoal fires in areas closed to wood fires; and (3) to allow on a case-by-case basis wood campfire use by commercial pack stations in closed areas using wood packed in from an approved source. AR 8886, 8903–04. These proposals generated strong opposition from Yosemite National Park and Sequoia and Kings Canyon (SEKI) National Parks because of the likely harmful environmental consequences. For example, regarding the proposal to allow operators to pack in firewood, the Superintendent of the Yosemite National Park wrote:

> We feel it would have serious ecological and experiential impacts because it is unlikely that use of the fires in the closed areas could be limited only to the intended parties with packed-in wood. Moreover, it is possible that non-native fungal pathogens, insects, seed and other invasives might be brought in with the wood.

AR 10174. The Acting Superintendent of the Sequoia and Kings Canyon National Parks wrote, regarding the practice of packing in charcoal and firewood:

> We strongly oppose the packing in of firewood or charcoal to areas where fires are generally prohibited.... By bringing in firewood, there is a risk of importing non-native, and potentially harmful,

pathogens and materials, e.g., weed seeds. There is also a compliance issue in that coals/ashes may be dumped counter to instructions to remove these materials.... This practice would have other effects as well, including requiring additional stock to carry the wood/charcoal (which would increase impacts and costs to clients), the false impression that fires are allowed in what are supposed to be 'closed' areas to other user groups, and the potential dissatisfaction of those other user groups who subject themselves to citations and may feel that a double-standard exists for the benefit of a commercial entity.

AR 11864–65.

Further, the Forest Service itself previously determined that allowing fires made with packed-in wood did not alleviate the harm caused by such fires to the wilderness. AR 846 (2001 FEIS stating: "... packing in firewood did not lead towards a reduction of impacts" in closed areas); AR 1382 (2001 ROD stating: "Permitting firewood and charcoal to be packed in would allow fires without knowledge of where the fuels came from, causing confusion for visitors and rangers alike. Rangers trying to enforce the closure would have difficulty determining if a campfire is entirely made up of packed-in wood. Visitors may misunderstand the closures if they see campfires occurring in closed areas. This, we believe, could lead to compliance problems and equity issues, ....").

Defendants defend the change in campfire regulation by pointing to the adaptive management strategy, which provides tools for allowing campfires above the elevational closures if certain conditions are met or if a ranger conducts an assessment and permits the campfire. AR 8940. Further, they argue that the changes to campfire regulations are not significant in the 2005 Plan. Defs.' Reply at 38. Taken

alone, the fact that the Forest Service changed its policy does not demonstrate a violation of NEPA or the Wilderness Act. However, the specific change here was arbitrary and capricious in violation of NEPA and of the prohibition in the Wilderness Act on commercial services except "to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas." Packing in firewood and coal will increase stock usage and loads, causing further damages to the wilderness, as noted by the Acting Superintendent of the Sequoia and Kings National Parks. Further, packing in firewood risks introducing pathogens. AR 8489 ("Under this alternative [2–Modified], there would be a moderate risk of the introduction of pathogens and/or weed seeds on firewood brought in from outside the wilderness and increased unauthorized gathering of wood and campfires by non-packer clients.... If pathogens or weeds were introduced, the effects would be long-term, moderate to severe, and although beginning locally, could easily become widespread.").

In addition, the Plan permits campfires in wilderness areas where "more than one site indicates dead and downed fuel wood availability rated at '3' or below [on a scale of 1 to 5]." AR 7517. At the hearing, the parties discussed the impact of the firewood rule in the case of the Purple Lake area. This area straddles the elevational boundary and, according to Plaintiffs, has three campsites above 10,000 feet, all of which have only scarce wood. But, according to Plaintiffs, because at least one other campsite in the Purple Lake area has available wood, all campsites, including those above 10,000 feet with scarce wood, are open to gathering and burning wood.

This impact of the policy is not adequately analyzed in the FEIS.

The Forest Service failed to adequately consider warnings from adjacent wilderness areas about the dangers of its proposed campfire policy and improperly relied on adaptive management to control the campfire policy. This demonstrates that the Forest Service failed to take a hard look as required by NEPA at changing the elevational campfire closures. Nor did the Forest Service adequately consider the impacts on the environment under the Wilderness Act of the changed policy.

**The Forest Service's decision to implement a 15 person and 25 stock group size does not violate NEPA's requirement to consider reasonable alternatives.**

 Plaintiffs contend that the maximum party size limit of 15 persons and 25 stock violates NEPA because the EIS failed to consider the reasonable alternative maximum group size of 12 persons and 20 stock imposed by this Court's injunction from 2002 to 2005.[5] AR 8886. Defendants defend the party size limits, saying that wilderness party size is the lowest ranked problem in the wilderness. AR 8893 (In 1993, it was ranked as 13th in a list of problems identified by hikers.). Defendants also point to findings in the ROD to show that they took a hard look at this issue. AR 8893 (Less than 2% of commercial trips have party size larger than 12 persons and 20 stock: "With relatively few occurrences of large commercial pack stock parties in these wildernesses it does not seem either necessary or effective to arbitrarily reduce the party size to respond to social concerns expressed by a small percentage of visitors."); 8893 ("Reducing party size would not likely reduce

---

5. Plaintiffs stated at the hearing that they do not allege a violation of the Wilderness Act

with respect to the maximum group size.

the overall stock numbers (which is a greater concern) and may, in fact, lead to a greater number of small parties and stock."). Defendants also point to neighboring wildernesses that use the 15 persons and 25 stock limits, except for SEKI, which uses a 15 persons and 20 stock limit. AR 8893.

An EIS must "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. The range of reasonable alternatives is measured against the "Purpose and Need" section in the Environmental Impact Statement for the proposed rule:

> Project alternatives derive from an Environmental Impact Statement's "Purpose and Need" section, which briefly defines "the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. The stated goal of a project necessarily dictates the range of "reasonable" alternatives and an agency cannot define its objectives in unreasonably narrow terms.

*Carmel–By–The–Sea v. United States Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir.1997). The 2005 Plan identifies two needs to be addressed: additional guidance for managing commercial pack stock operations, and a trail plan that accurately identifies a system of trails for all users and appropriate trail management objectives for each trail. AR 7479. The Plan further specifies several goals: to comply with the Wilderness Act by preserving wilderness character; to provide for needed commercial pack stock services; to comply with the Court's injunctive relief order; to identify monitoring requirements to facili-

tate responsive adaptive management for commercial pack stock use; and to identify the appropriate level of grazing associated with commercial pack stock operations. AR 7479–80.

The group size limit of 12 persons and 20 stock was included in Alternative 4 to the EIS (AR 7541), albeit only briefly. While it would have been helpful for the Forest Service to analyze the impact of the Court's prior limitations of party size to 12 persons and 20 stock before deciding whether to increase the limit in view of the goals of wilderness and resource protection, the Court does not conclude that the Forest Service violated NEPA. The Forest Service pointed to research that "party size may have the least effect on physical impacts than other managerial controls," and that "of these behaviors [party size limits, requiring feed to be packed in for stock, encouraging riders to stay on trails, restricting loose herding of stock on trails, restricting the practice of tying stock to trees, encouraging the use of hitchlines, restricting the practice of picketing stock, encouraging the practice of hobbling stock] limits on party size may have the least effect on physical impacts." AR 8892–93; *see City of Carmel–by–the–Sea*, 123 F.3d at 1154–55 ("The Environmental Impact Statement need not consider an infinite range of alternatives, only reasonable or feasible ones.") (citing 40 C.F.R. § 1502.14(a)-(c)).

**Muir Trail Ranch**

 Motorized vehicles are generally prohibited in the wilderness. *See* 16 U.S.C. § 1133(c). Since 1948, Muir Trail Ranch has been operating a guest ranch in the wilderness under a special use permit for using and maintaining a jeep access road between a boat landing and the guest ranch. AR 8108; 8753. Access to the ranch is by four-wheel drive. AR 8108. Some route confusion and a high density of

trails has resulted from the presence of the road to Muir Trail Ranch. *Id.* However, the Forest Service determined that analysis of the access to this private land was outside the scope of the FEIS. AR 8753.

The Wilderness Act preserves "such rights as may be necessary to assure access to ... State-owned or privately owned land," which likely grandfathers in use of this road. 16 U.S.C. § 1134(a). Moreover, a House Report recommending passage of the California Wilderness Act, 16 U.S.C. § 543, *et seq.*, notes that "the boundaries of the wilderness additions [under the California Wilderness Act] were drawn with the understanding that traditional motorized access will be allowed in the private inholdings within the wilderness by special use permit," and concludes that "the designation as wilderness will not preclude the Forest Service from continuing to issue appropriate special use permits for access to and from those properties." SAR 0001–03; H.R.Rep. No. 98–40, at 21–22 (1983).

The Court agrees with Defendants that the Forest Service did not act arbitrarily in concluding that this issue is outside the scope of the FEIS. Although Plaintiffs argue that the Muir Trail Ranch road is used in some unknown part for commercial packstock services, there is no evidence in the record that this use is frequent or significant, and the road is authorized as necessary to allow access to private land.

## IV. Conclusion

Accordingly, Plaintiffs' Motion for Summary Judgment and Defendants' Cross–Motion for Summary Judgment are granted in part and denied in part. The Court will hold a status conference on November 20, 2007 at 10:00 a.m. to discuss with the parties a briefing schedule for injunctive relief. A joint statement containing a proposed briefing schedule shall be filed no later than November 13, 2007. In preparing their joint statement, the parties should keep in mind that the Court prefers staggered, rather than simultaneous, briefing.

**IT IS SO ORDERED.**